IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOEL MEREDITH #317-978          :

    Plaintiff                  :

  v.                              :  CIVIL ACTION NO. WDQ-13-1497

CORIZON, INC., f/k/a CORRECTIONAL  :
  MEDICAL SERVICES[1]
WEXFORD MHEALTH SOURCES, INC.    :
DR. PETER GESTA
VICKI WARD, LPN                  :
DR. KRISHNA SWANG
DR. ARRISUENO                    :
DAVID MATHIS, MD
DR. KRAMER                       :

    Defendants                 :

## MEMORANDUM OPINION

On December 11, 2003, Plaintiff Joel Meredith (hereinafter, "Meredith") was sentenced by the Circuit Court for Caroline County to fifteen years of incarceration in *State of Maryland v. Joel Lee Meredith, Jr.*, Criminal No. 05K0305754.[2] He was released from prison on August 13, 2013, and currently resides in Denton, Maryland. ECF No. 21.

On May 21, 2013, Meredith filed a civil rights action pursuant to 42 U.S.C. § 1983, seeking money damages and injunctive relief.[3] Meredith claimed a violation of the Eighth Amendment prohibition against cruel and unusual punishment, and alleged that "from May 25, 2010, the medical providers and doctors . . . showed deliberate indifference towards my serious medical conditions . . . resulting in the amputation of my left leg, leaving me permanently

---

[1] The Clerk shall amend the docket to reflect the full and proper spelling of the Medical Defendants' names, as reflected in the caption of this Memorandum Opinion.

[2] *See* http://casesearch.courts.state.md.us/inquiry/inquiryDetail.jis?caseId=05K03005754&loc=50&detailLoc=K

[3] Meredith sought a court order requiring the Medical Defendants to provide him with a prosthetic leg. ECF No. 1 at 3.

disabled and wheelchair bound." ECF No. 1 at 3. Several of the Medical Defendants, including Wexford Health Sources, Inc. ("Wexford"), Corizon, Inc. ("Corizon," formerly known as Correctional Medical Services), Licensed Practical Nurse Vicki Ward ("Ward"), and David Mathis, MD ("Mathis") have filed unopposed[4] dispositive motions that shall be construed as Motions for Summary Judgment.[5] ECF Nos. 28 and 32. A hearing is not needed to resolve the pending motions. *See* Local Rule 105.6 (D. Md. 2011).

## Background

Meredith is a man in his mid-fifties with a medical history of insulin dependent diabetes mellitus type II. ECF No. 28-5 at 2, Affidavit of Colin Ottey, M.D. With type II diabetes, the body does not use insulin properly and cannot make enough insulin to keep blood glucose ("sugar") at normal levels.[6] The disease carries the possibility of many complications, including kidney disease, high blood pressure, neuropathy, skin problems, infections and diabetic blisters. *Id.* Foot ulcers and poor circulation in the lower limbs may occur, and diabetics are far more likely to require foot or leg amputation due to nerve disease and/or peripheral arterial disease ("PAD"). *Id.* While incarcerated, Meredith's diabetes was not well controlled, in part due to his obesity,[7] long-standing hypertension, and non-compliance with treatment protocols. ECF No.

---

[4] The record shows that Meredith was served with notice of the Medical Defendants' filings pursuant to the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). Notices were mailed on September 17 and November 12, 2013. ECF Nos. 30, 34. As of the within signature date, no opposition response has been filed.

[5] As discussed further herein, the dispositive submissions will be treated as motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure because materials outside the four corners of the document have been considered. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).
   For reasons apparent herein, had the remaining unserved Medical Defendants (Dr. Gesta, Dr. Swang, Dr. Arrisueno and Dr. Kramer) been served with the Complaint, they, too, would be entitled to dismissal from this suit.

[6] *See* http://www.diabetes.org/living-with-diabetes/complications/

[7] In January of 2010, Meredith was morbidly obese, standing 6 feet tall and weighing 302 pounds. ECF Nos. 28-5, 28-6.

28-5 at 2. As a result, he developed peripheral neuropathy,[8] chronic renal failure, lower extremity ulcers, and impaired wound healing. In 2007, Meredith developed osteomyelitis[9] that required amputation of the second toe of his left foot. *Id.*

Meredith claims he was met with deliberate indifference to serious medical needs beginning on May 25, 2010, and continuing thereafter. During this period, the State of Maryland changed its contractual relationship with prison medical service providers Corizon and Wexford. Prior to July 1, 2012, Corizon was responsible for providing direct patient medical services, while Wexford provided support services other than patient care.[10] On July 1, 2012, Wexford was awarded the contract for all aspects of prisoner health services, including direct patient care. ECF No. 28-4 at 2.

Although Meredith's complaint focuses on his treatment subsequent to May 24, 2010, his medical status during the earlier part of 2010, while Meredith was housed at ECI, sheds light on the complexity of Meredith's orthopedic problems. On January 19, 2010, Corizon personnel requested that Wexford refer Meredith to a podiatrist to evaluate callus formation and blisters on his left foot. The request was approved on January 26, 2010. ECF No. 28-4 at 4. On March 5,

---

[8] Peripheral neuropathy encompasses a wide range of disorders in which the nerves outside of the brain and spinal cord -- peripheral nerves -- have been damaged. The diabetes-peripheral neuropathy link has been well established. A typical pattern of diabetes-associated neuropathic symptoms includes sensory effects that first begin in the feet. The associated pain or pins-and-needles, burning, crawling, or prickling sensations form a typical "stocking" distribution in the feet and lower legs. Other causes of peripheral neuropathy include chronic renal disease and atherosclerosis. *See* http://medical-dictionary.thefreedictionary.com/peripheral+neuropathy.

[9] Osteomyelitis is an inflammation or infection of the bone caused by trauma, bacteremia, surgery, or orthopedic implants that disrupt the integrity of the bone, as well as from overlying infections, such as those associated with diabetic foot ulcerations. Surrounding soft tissues are often involved as well. *See* https://www.clinicalkey.com/topics/orthopedic-surgery/osteomyelitis-in-adults.html.

[10] Prior to July 1, 2012, Wexford, working under contract with Maryland's Department of Public Safety and Correctional Services, provided onsite utilization review management services to arrange offsite medical and clinical services, including hospitalizations and specialized medical and clinical services, to Maryland prisoners. *See Robinson v. Western Maryland Health System Corp., et al.*, Civil Action No. DKC-10-3223 (D. Md.), ECF No. 26-3.

2010, Wexford received a request for evaluation by a podiatrist for follow-up care related to the left foot for abscess formation and cellulitis.[11] The request was approved. *Id.* A March 12, 2010 request for additional evaluation by a podiatrist and follow-up care of the left foot also was approved. *Id.*

In the spring of 2010, Meredith twisted his left ankle. ECF No. 28-6 at 7-8. X-rays reported on April 21, 2010, showed degenerative changes but no acute fracture. Due to ongoing complaints of pain and swelling, on May 21, 2010, the podiatrist recommended an MRI to rule out osteomyelitis. *Id.* at 8. The MRI was approved by Wexford on May 24, 2010 and completed the next day, May 25, 2010. *Id.* at 600.

By May 25, 2010, Meredith was housed in the ECI infirmary and under constant medical supervision due to his multiple chronic medical problems. ECF No. 32-2, Ex. A at 209.[12] At that time, Meredith required twenty-one medications, supplements and topical ointments to treat his various conditions. *Id.* at 218.

Defendant Mathis first treated Meredith on May 25, 2010, and remained his primary prison physician until October 27, 2010. On May 26, 2010, Mathis examined Meredith and reviewed the results of the MRI, which revealed soft tissue inflammation in the left foot near a small abscess. Mathis conferred with colleagues and ordered an urgent consult with orthopedic specialists as the MRI suggested osteomyelitis[13] may be present. Meredith's IV antibiotic

---

[11] Cellulitis is acute inflammation of the dermis and subcutaneous tissue, sometimes involving muscle. Hallmarks are erythema, edema, tenderness, and warmth. Patients most likely to develop cellulitis include those with diabetes and previous cellulitis. *See* https://www.clinicalkey.com/topics/surgery/cellulitis.html.

[12] Corizon has used the Bates pagination system in its Exhibit A, which is numbered "Wexford 209" through "Wexford 2248." Records not relevant to this response were provided in response to Defendant Wexford's subpoena and are not included in Exhibit A. Corizon's pagination shall be adopted and referenced here.

[13] Osteomyelitis can occur when germs travel through the bloodstream or are spread from nearby tissue, but can also begin in the bone itself if an injury exposes the bone to germs. *See* http://www.mayoclinic.org/diseases-conditions/osteomyelitis/basics/definition/con-20025518. Mathis sought a recommendation from the specialist

treatments were increased and lab work ordered. *Id.* at 225. Wexford immediately approved the request, and Meredith was seen by the orthopedic specialist, Michael Ward, M.D., on May 27, 2010. ECF No. 28-4, Affidavit at 5.

Both Mathis and Ward concurred that a below-the-knee amputation was necessary due to the infection and complications arising from his diabetic circulation issues. The request for amputation was submitted by Mathis at this time. ECF No. 32 at 245-52. Mathis examined and monitored Meredith's condition during infirmary rounds on June 1, 2 and 4, 2010. *Id.* at 279, 302, 310.

A below-the-knee amputation of Meredith's left leg was performed at Dorchester General Hospital on June 7, 2010. Mathis examined Meredith following the surgery on June 9, 11, 14 and 15, 2010, during infirmary rounds. *Id.* at 346, 361, 379, 387; ECF No. 28-6 at 496-504. Mathis requested, and Wexford approved, post-amputation physical therapy to teach Meredith to use crutches and transfer from bed. ECF No. 28-6 at 569. During these visits, Mathis adjusted Meredith's pain medications, ordered him to remain in the infirmary on surgical convalescence, and noted that the stump was not tapering appropriately, a problem which would likely lead to difficulties fitting a prosthesis. ECF No. 32-2 at 346-387. On June 16, 2010, Mathis noted the need for a "stump shrinker" to aid with the healing process at the surgical site. *Id.* at 393. On June 18, 2010, Mathis noted good healing and suggested a decrease in narcotic medication. *Id.* at 426. He examined Meredith daily between June 21-25, 2010, noting continuing pain, increasing ambulation, and the absence of medication-seeking behavior. Pain medication was increased at night due to Meredith's complaints of overnight pain. *Id.* at 426, 434, 442, 448, 455.

---

concerning debridement, bone biopsy, and placement of a PICC line for long-term intravenous delivery of antibiotics, and expressed concern that if treatment was unsuccessful, amputation might be needed. ECF No. 28-6; ECF No. 28-4 at 5.

5

On June 28 and 29, 2010, Mathis gave permission for Meredith to leave the infirmary during the day and ordered that use of the stump shrinker begin in five days. Mathis also requested Meredith be given special authorization for religious visitation to assist with Meredith's recovery. *Id.* at 472, 478, 483.

Mathis next examined Meredith on July 8, 2010. *Id.* at 539. On July 9, 2010, Mathis noted that the sutures had begun to open to a small degree at the wound site, ordered the wound to remain wrapped, and the course of care remain in place. *Id.* at 544. On July 14, 2010, Meredith complained of increasing pain at the surgical site. Mathis noted increased bleeding at the wound site and ordered changes to the type of wound dressings to be used. *Id.* at 577. The following day, Mathis noted the absence of infection, but increased drainage at the wound site, and ordered use of a wound vacuum to promote healing. *Id.* at 584. On July 16, 2010, Mathis ordered a special shoe for Meredith's right foot to prevent diabetic-related ulcers. *Id.* at 584.

On July 19, 2010, Mathis noted increased drainage and overall deterioration of the wound site, ordered continuation of the Wound V.A.C. and antibiotics, and requested consultation with other providers. *Id.* at 610. The following day he noted that consultation with a specialist was pending. *Id.* at 614. The infectious disease specialist examined Meredith on July 22, 2010, and informed Mathis that no cellulitis was found and the wound site "looked pretty good." *Id.* at 634 and 644.[14] Mathis examined Meredith on four additional occasions in July of 2010, during which he altered the wound dressing change schedule, discontinued the wound vacuum, and noted improvement. *Id.* at 665, 671, 683, 687.

---

[14] Based on the medical records, the Court infers that Dr. Ward performed the amputation; however, Meredith does not provide enough detail in his Complaint to clarify what role "Dr. Ward" played in the alleged denial of appropriate medical care. "Dr. Ward" is also referenced regarding the July 22, 2010, infectious disease consultation. To the extent "Dr. Ward" was the surgeon who performed the amputation or an infectious disease specialist who examined Meredith's wound, he does not appear to be a "state actor" amenable to suit under § 1983.

Mathis' care continued in August of 2010. On August 2, 2010, Mathis noted that wound revision surgery may be needed. The following day he requested approval for the surgery to be performed by Ward. *Id.* at 708, 821. Mathis talked with Ward following the August 9, 2010, wound revision surgery and learned that a hematoma (blood boil) was removed and a wound drain inserted. *Id.* at 755. Mathis continued to treat Meredith during August and removed all remaining staples on August 26, 2010, because the area was healing. *Id.* at 762, 777, 782, 799, 806, 849, 855.

September saw slow but incremental improvement to the wound site. Mathis continued to examine Meredith regularly. *Id.* at 1071, 1063, 1033, 1027, 1013, 997, 995,. 987, 981, 957, 951, 945, 938, 931, 899, 895. Meredith complained little, other than to express displeasure as to the length of his stay in the infirmary.

On October 2, 2010, Mathis examined Meredith, noted some wound drainage, and expressed concern that further surgical intervention would be needed due to Meredith's inability to heal. *Id.* at 1223. Three days later, Mathis noted ulceration at the wound site and requested an orthopedic follow-up appointment. *Id.* at 1199. On October 15, 2010, Mathis noted that the wound has finally "turned the corner" and scabbed over, and also requested a follow-up with the orthopedist at this time. *Id.* at 1150. On October 20, 2010, Meredith expressed a desire to lessen dependence on a wheelchair to Mathis. *Id.* at 1124. When Mathis examined Meredith's right foot on October 26, 2010, he noted a possible diabetic complication to the great toe. *Id.* at 1098. Mathis' final visit with Meredith occurred on October 27, 2010, one day prior to Meredith's discharge from the infirmary; at that time, the stump was doing well and a plan to fit Meredith for a prosthesis was in place. *Id.* at 1091, 1084.

On February 4, 2011, Wexford received a consultation request for an specialist to fit Meredith with a prosthetic leg. The request was approved and Meredith was evaluated by an othotic specialist who indicated that he could not be fitted for a prosthetic leg due to swelling. Once the swelling decreased, the fitting would be rescheduled. ECF No. 28-4; ECF No. 28-6 at 454.

On April 18, 2011, a request was submitted to Wexford for approval of an MRI with contrast and evaluation with the orthopedic specialist to rule out osteomyelitis. This request was approved and the study was completed on April 18, 2011. ECF No. 28-4 at 1; ECF No. 28-6 at 601. On May 3, 2011, a request was submitted to Wexford to approve Meredith's return to Ward for further management of his amputation stump. The request was prompted by the chronic drainage from the wound and the findings of an MRI revealing the tibia was in a location that made properly fitting a supporting prosthesis difficult. This request, as well as a request for additional sessions of physical therapy for upper body strengthening, were approved. *Id.*

On May 13, 2011, Ward examined Meredith and recommended a second opinion as to whether another surgical revision of the stump was necessary to address Meredith's chronic wound issues and for improved coverage for his prosthetic device. On May 31, 2011, following his review of an MRI, Ward recommended an above-the-knee amputation based on Meredith's chronic wound infections and joint dysfunction. ECF No. 28-6 at 409. Ward concluded that additional amputation would allow more soft tissue coverage of the stump to promote wound healing. *Id.* However, because Ward did not perform above-the-knee ("AKA") amputations, he recommended Meredith be referred to a vascular or plastic surgeon. *Id.*

On July 13, 2011, prison medical providers addressed the request for specialty consultation. *Id.* at 17. The note from that meeting reflects as follows:

8

> Meeting today to discuss [Meredith's] ambulatory status and potential transfer of [Meredith] to a wheelchair accessible/ADA compliant facility . . . The problem doing an AKA is that [Meredith] already does not heal well and a new incision wound would not do much better than the current one; and if [Meredith] had an AKA done then a new prosthetic would need to be ordered and we are probably looking at the same obstacles we are dealing with now. [Meredith] had PT several times currently he is focusing on upper body strength to help get him on crutches. [Meredith] is not motivated with PT and does not do exercises on his own, he does not try to get out of wheelchair. Due to [Meredith's] protracted course and lack of progress with getting his prosthetic, it is my opinion, as the opinion of the providers that see and treat Mr. Meredith that he will continue to stay in his wheelchair. We have exhausted all options to try and get him ambulatory and he should be considered a wheelchair bound patient thus he should be moved to an appropriate facility that can care for his needs under ADA guidelines.

*Id.* Meredith was subsequently transferred from ECI to WCI. On August 16, 2011, under the care of his WCI medical providers, a consult was presented on Meredith's behalf to Wexford for a second opinion for consideration of the above-the-knee amputation. ECF No. 28-4; ECF No. 28-6 at 463-465. The request was approved on September 16, 2011, Meredith was evaluated by Ashkok Krishnaswamy, M.D. at Bon Secours Hospital. ECF No. 28-6 at 413-14. Dr. Krishnaswamy recommended irrigation and debridement of the amputation stump for scar revision, which was approved by Wexford on September 23, 2011. The procedure was completed on October 25, 2011, at Bon Secours Hospital ("BSH"). *Id.* at 513-16. Wexford also approved Meredith's follow-up evaluation with the orthopedic surgeon, as well as placement of a PICC line. The PICC line was placed at Western Maryland Health System ("WMHS"). ECF No. 28-6 at 517-21.

Wexford denied a December 2, 2011 request for evaluation by the orthopedic surgeon to address complaints that two sutures were embedded in Plaintiff's leg. Medical staff re-wrote the request as a follow-up orthopedic evaluation, and it was approved. ECF No. 28-4.

On January 27, 2012, Plaintiff was evaluated by Dr. Krishnaswamy at BSH. ECF No. 28-6 at 415. On February 2, 2012, a request was submitted to Wexford for a follow-up evaluation with the orthopedic surgeon; Meredith, however, informed his health care providers that he would refuse any further trips to Bon Secours Hospital. ECF No. 28-6 at 36. In response, on February 14, 2012, it was recommended that a therapy known as "topical 02"[15] be used to close Meredith's wound. Wexford approved the request. ECF No. 28-6 at 38.

Requests for renal ultrasound and a nephrology specialist were approved. ECF No. 28-4. Ultrasound of the kidneys was normal. ECF No. 28-6 at 603. On June 15, 2012, Meredith failed to show up for a scheduled visit to nephrologist Mages Gebremariam, M.D. *Id.* at 42, 10.

As previously noted, on July 1, 2012, Wexford became the primary medical contractor in addition to the utilization review manager. At that time, Meredith still had an open and draining wound to the outer left side of the stump and was receiving dressing and wound care changes three times a week. ECF No. 28-6 at 45-52. On July 27, 2012, Meredith was evaluated by a nephrology specialist for his diabetes. *Id.* at 418. The specialist noted that Meredith had lost weight and was maintaining fairly good control of his diabetes. No changes were made to his treatment plan for his diabetes. *Id.*

On August 13, 2012, a second small area with potential skin breakdown to a portion of the stump was identified by nursing staff, and Meredith was referred to Ava Joubert, M.D. for evaluation. Joubert ordered Meredith placed on Bactrim[16] while a wound culture was completed. *Id.* at 64-67. The culture revealed streptococcus responsive to the antibiotic Meredith was

---

[15] Topical oxygen therapy may be considered as a second line of therapy for refractory wounds. *See* http://www.ncbi.nlm.nih.gov/pubmed/19443899.

[16] Bactrim is classified as a sulfa antibiotic. It is a combination of sulfamethoxazole and trimethoprim and is used to treat a variety of infections. *See* http:1/www. drugs.com/search. php?searchterm=Bactrim.

receiving. *Id.* at 566. Regular nursing wound evaluation and dressing changes were continued. *Id.* at 68-73. On September 17, 2012, Joubert noted that Meredith's fasting glucose was running high and ordered Meredith's insulin dose increased. *Id.*, pp. 74-76.

On October 2, 2012, Meredith was evaluated by Ali Yahya, M.D., who noted a two-year history of chronic wound problems, including intermittent drainage and infections following the below-the-knee amputation. *Id.* at 80-81. Because the stump was red and showed discharge drainage containing blood and pus, Yahya requested Meredith be evaluated by a surgeon for further management recommendations. In the meantime, Meredith's wound care treatment plan, which included tri-weekly nursing evaluations and dressing changes, continued. *Id.* at 83-87, 91-98, 102-22, 130-32.

On October 26, 2012, physicians' assistant Beverly Sparks noted that Meredith's diabetes was uncontrolled on his current dosage of insulin; the insulin dose was increased. *Id.* at 88-90. Accordingly, Meredith's insulin dose was again increased. On November 1, 2012, physicians' assistant Flury prescribed Metronidazole and Doxycycline.[17] Flury noted that the surgical consult remained pending. *Id.* at 99-101. On December 30, 2012, Meredith was evaluated by physicians' assistant Quinta Lum, who noted moderate drainage but no odor, purulent drainage, warmth, erythema or signs of cellulitis. *Id.* at 123-125.

On January 20, 2013, Meredith was admitted to the infirmary due to increased drainage from his wound site. Intravenous antibiotics, a wound culture, and x-rays were ordered. *Id.* at 134, 137-38. X-rays showed degenerative changes in the knee joint with diffuse osteopenia.[18]

---

[17] Doxycycline and Metronidazole are two antibiotics used in the treatment of infections.

[18] Osteopenia is the reduction in bone mass, usually caused by a lowered rate of formation of new bone that is insufficient to keep up with the rate of bone destruction. *See* http://www.webmd.com/osteoporosis/tc/osteopenia-overview.

11

*Id.* at 605. Meredith's wound showed the presence of MRSA and acinetobacter.[19] *Id.* at 567. On January 27, 2013, Joubert placed him on a new antibiotic sensitive to the microbe strains identified on wound culture. She also noted that Meredith's oral diabetic medications would be resumed in addition to his injected insulin regimen as Meredith's diabetes was poorly controlled as demonstrated by his high fingerstick results. Joubert also requested approval of Plaintiff's reevaluation by the surgeon that was subsequently approved. *Id.* at 187-88; ECF No. 28-4.

On January 28, 2013, Meredith indicated he would undergo additional above-the-knee amputation. *Id.* at 192. On February 6, 2013, he was evaluated by surgeon Juan Arrisueno, M.D., who recommended an amputation above-the-knee as a reasonable course of care, given Meredith's wheelchair-bound status and the fact that other treatments failed to close the wound. Before performing the surgery, Arrisueno requested radiological documentation by either an MRI of the left stump or a bone scan to confirm the presence of osteomyelitis. *Id.* at 421-22.

On February 14, 2013, Meredith was discharged from the infirmary back to general population. *Id.* at 215-16. On February 20, 2013, Plaintiff was evaluated by WCI's Medical Director, Colin Ottey, M.D., who found a small amount of drainage at the amputation site with ulceration. Dr. Ottey noted that prior MRI studies taken of the leg would be discussed with Meredith's surgeon, who had requested repeat MRI studies. *Id.* at 218-20. On February 21, 2013, tri-weekly wound care was re-implemented for evaluation of the stump wound and for regular dressing changes. *Id.* at 222.

Following discussion with Dr. Arrisueno regarding the results of the MRI, surgery to perform the amputation was approved on March 26, 2013. ECF Nos. 28-4, 28-5. On April 15, 2013, Meredith underwent an above-the-knee amputation of the left leg at WMHS. Pathology

---

[19] Acinetobacter bacteria are commonly resistant to multiple antimicrobial medications and such infections often occur in situations where healthcare is provided for wounds. *See* http://www.ncbi.nlm.nih.gov/pubmed/20210684.

testing revealed osteomyelitis in the bone as well as granulation tissue with acute and chronic inflammation of the underlying soft tissue. ECF No. 28-6 at 522-38. Meredith was discharged from WMHS to WCI's infirmary on April 18, 2013, for post-operative recovery including monitoring and wound care of the surgical site. *Id.* at 293-94.

On May 3, 2013, Meredith was seen by Arrisueno for follow-up care and reported no complaints. Arrisueno noted that the incision was well healed with no redness, drainage or tenderness. Sutures and a drain were removed and steri-strips applied. Arrisueno recommended that Plaintiff be returned for follow-up to evaluate healing of the stump once swelling at the surgical site had resolved. *Id.* at 423. That same date, Meredith was evaluated by Ottey and cleared for discharge from the infirmary. Discharge orders included daily wound evaluation and dressing changes, and Meredith was instructed to keep his leg elevated. *Id.* at 309-11.

On May 20, 2013, registered nurse practitioner Peggy Mahler noted the wound had no redness, increased warmth or drainage. *Id.* at 344-45. Mahler identified an area of pink tissue along the wound site but concluded that the incision site was not infected and that daily dressing changes should continue. *Id.* Nursing evaluation and dressing changes continued on May 21-26, 2013. *Id.* at 346-57. On May 26, 2013, Monica Stallworth, M.D., found no tenderness or infection. *Id.* at 358-60.

On May 27-31 and June 1-5, 7-10 and 12, 2013, Meredith was seen by nursing staff for dressing changes and wound evaluation, at which time wound care was discontinued because the site seemed healed. *Id.* at 361-85, 388.

On July 2, 2013, Meredith was seen by nursing staff for a chronic care assessment and raised no complaints regarding the leg. On July 10, 2013, he visited the medical department to obtain medical paperwork for reinstatement of his license on release from prison. *Id.* at 389,

391. Prior to his August 6, 2013 release from prison, Meredith met with medical staff to review his medication regimen and to receive training in self-insulin administration and operation of the accucheck machine he would be taking with him to monitor his blood glucose levels. *Id.* at 393-95.

## Standard of Review

Defendants' motions are styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[20] In any event, in accordance with *Roseboro v. Garrison*, 528 F.2d

---

[20] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to doconvert the motion by indicating that it will not exclude from its

309, 310 (4th Cir. 1975), Meredith was informed of his right to file a response to the Motions, and the opportunity to submit affidavits, declarations, and other documentary evidence. As noted, he has not filed an opposition response.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties" procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). Generally, to raise adequately the issue that discovery is needed, the party opposing the motion must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed

---

consideration of the motion the supporting extraneous materials."); *see also Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.*, Civ. No. JFM-10-0206, 2010 WL 2732334, at *3, 2010 U.S. Dist. LEXIS 68772, at *8-10 (D. Md. July 8, 2010).


discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). Meredith has not filed an affidavit under Rule 56(d). It is therefore appropriate to address Defendants' motions as motions for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: by its very terms, this standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Fourth Circuit has explained that the party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [his] pleadings, but rather must" set forth specific facts showing that there is a genuine issue for trial. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). However, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in [his] favor without weighing the

evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The court must, however, also abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial. *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (*quoting Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), *and citing Celotex Corp.*, 477 U.S. at 323-24).

## Analysis

Meredith has named both Wexford and Corizon as parties to this action, presumably under the theory of vicarious liability known as *respondeat superior*. *Respondeat superior* liability does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no *respondeat superior* liability under § 1983); *Nedd v. Correctional Medical Services*, Civil Action No. JFM-92-1524 (D. Md., October 22, 1992) (same), *citing Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *McIlwain v. Prince William Hospital*, 774 F.Supp. 986, 990 (E.D.Va. 1991). Meredith may, however, proceed in his § 1983 action against the individual health care providers employed by these corporations.

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). When contractual prison health care providers show "deliberate indifference to serious medical needs of prisoners," their actions or inactions may amount to an Eighth Amendment violation. *Estelle*, 429 U.S. at 104. The health care providers must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must also draw the inference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The medical treatment provided "must be so grossly

incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," and a defendant must know of and disregard an excessive risk to inmate health or safety. *See Miltier v. Beorn,* 896 F.2d 848, 851-52 (4th Cir. 1990) (. "[T]he [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer,* 511 U. S. at 837 (1994). Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms. *See Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998).

Mere negligence or malpractice does not rise to a constitutional level.[21] *See Miltier,* 896 F.2d at 852; *see also Short v. Smoot,* 436 F.3d 422, 427 (4th Cir. 2006) (*quoting Farmer,* 511 U.S. at 835). Furthermore, a prisoner's disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. *See Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones,* 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer,* 528 F.2d 318 (4th Cir. 1975).

Medical records clearly demonstrate that Meredith was provided ongoing medical care, including tests, referrals to specialists, therapy, medications, and monitoring, in an effort to control his diabetes and ameliorate the damage caused by that invidious disease. Unfortunately, all efforts failed, resulting in amputation. The resulting stump did not heal and despite repeated medical intervention, additional amputation proved necessary. The failure to heal further impeded efforts to fit Meredith with a prosthesis, and resulted in his remaining wheelchair-bound. None of these consequences, however unfortunate, occurred as a result of civil rights violations inflicted by the named Defendants or other medical care providers.

---

[21] To the extent Meredith seeks recovery based on medical negligence or medical malpractice, the Court declines to accept supplemental jurisdiction over these claims and makes no findings with regard to the care provided by any medical personnel involved in Meredith's surgery and wound care.

Accordingly, Defendants' dispositive motions shall be granted and the case closed by way of a separate order.

6/10/14
(Date)

_____
William D. Quarles, Jr.
United States District Judge